June CARABELL, and individual, Keith Carabell, an individual, Harvey Gordenker, an individual, and Frances Gordenker, an individual, Plaintiffs,

v.

The UNITED STATES ARMY CORPS OF ENGINEERS and THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendants.

No. 01–CV–72797.

United States District Court,
E.D. Michigan.
Southern Division.

March 27, 2003.

Timothy A. Stoepker, Paul R. Bernard, Jennifer P. Fitzgibbons, Detroit, MI, for Plaintiffs.

Laurel A. Bedig, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, Geneva S. Halliday, Assistant U.S. Attorney, Detroit, MI, for Defendants.

*ORDER (1) ACCEPTING THE MAGIS-TRATE JUDGE'S REPORT AND RECOMMENDATION, (2) GRANT-ING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT*

BORMAN, District Judge.

The Court has reviewed the magistrate judge's Report and Recommendation, filed on February 28, 2003. The Court has also reviewed the Plaintiffs' Objections to the Report and Recommendation, which was filed on March 14, 2003.

**IT IS ORDERED** that the Report and Recommendation (Docket # 22) is accepted and entered as the findings and conclusions of this Court, that Plaintiffs' motion for summary judgment is DENIED, and that Defendants' motion for summary judgment is GRANTED.

### REPORT AND RECOMMENDATION

CAPEL, United States Magistrate Judge.

## I. INTRODUCTION

This matter is before the Court on the parties' cross-Motions for Summary Judgment filed on April 12, 2002, and May 31, 2002. Both Motions concern the denial of a 404 Permit by the Army Corps of Engineers ("COE"), to fill wetland on Plaintiffs' property. At issue is whether the COE has jurisdiction over Plaintiffs' property, and if so, whether the decision to deny the Permit was arbitrary and capricious.

## II. PLAINTIFFS' STATEMENT OF FACTS

### A. The Carabell Property

Keith and June Carabell own a 19.6-acre parcel of land located in Chesterfield Township, Macomb County, Michigan. The property is shaped roughly like an inverted right angle, with one leg running along a north-south line, and the other leg running along an east-west line. (*See* Site Location Maps, attached to Carabell's Application for Permit to Army Corps and MDEQ, DNR File No. 93–14–0602). The hypotenuse of the triangle runs along a northeast-southwest line, and a ditch for a county drain, the Sutherland–Oemig Drain, follows the hypotenuse for 1,800 feet. (*Id.*). The ditch is no wider than

four feet, and the water in it is no deeper than six inches.

An upland ridge runs along the west side of the drain; it was apparently formed by the sidecasting of spoils during the excavation of the ditch. (MDEQ Proposal for Decision, 8/12/99, at 11). This clay ridge prevents water from the forested area of the property from draining into the ditch. Another small amount of upland, less than four acres, is located in the southwest corner of the parcel. (*See* Site Location Maps, *supra*). The property is forested predominantly with swamp oak and cottonwood trees, and includes no man-made structures. (Leighton Testimony, 10/27/97 at 357).

The property retains an undetermined amount of water for an undetermined period, and it has not been established in the record whether the property retains this water on an annual basis or less frequently. (*See* Administrative Appeal Decision, 3/5/2001 at 3). The record evidence is uncontroverted on one point: the property **does not** retain water at all times. (MDEQ Proposal for Decision, 8/12/99 at 11). Moreover, it is also undisputed that the property **does not** have a surface water connection to any adjacent property or any adjacent body of water. (*Id.*). In short, the water that is periodically present in the forested portion of the property does not drain to the Sutherland–Oemig drain or to any body of water, it remains on the property until it is absorbed by the soil and vegetation.

The property abuts Donner Road, which runs along its north-south side, and it is near Interstate 94, which passes to its northwest. (*See* Site Location Maps, *supra*). A large subdivision of single-family homes is between the property and the freeway. (*Id.*). To the north of the property is 23 Mile Road, and, between that road and the property are a vacant field and several condominium and apartment complexes. (*Id.*). To the southeast of the property, on the other side of the Sutherland–Oemig Drain, is another subdivision of residential homes, and this subdivision borders Lake St. Clair. (*Id.*). To the east of the property is a vacant woodlot, several more residential subdivisions and then a large woodlot, which is slated for development into a residential subdivision. (*Id.*).

**B. Proceedings Before the MDEQ and Issuance of a Permit to Plaintiffs.**

In 1993, the Carabells applied to the MDEQ for a permit to fill 15.9 acres of the forested area of the property for the purpose of building 130 condominium units, along with the associated roads and utilities. In March 1994, the EPA filed written objections to the Carabell's application. The MDEQ then denied the application.

The Carabell's then filed an alternative plan, seeking to fill only 12.2 acres and build 112 condominium units. (MDEQ Application, *supra*). The alternative plan also proposed to construct retention ponds on 3.74 acres of the property; these ponds would filter any water draining across the property as a result of the development.[1] (*See* MDEQ Proposed Decision, 8/12/99).

The MDEQ then conducted a contested case hearing before an administrative law judge. The Carabells and the MDEQ submitted extensive testimonial and documentary evidence to the ALJ, who issued a proposed decision in August 1998 that recommended the issuance of the permit. Crucial to the ALJ's ruling was the fact that the property was isolated from any body of water:

---

1. To the extent that the development of the property allowed water from adjacent areas to drain across the property, the retention ponds would filter this water as well. (MDEQ Proposed Decision at 10).

This opinion is premised on the fact **the wetland does not have a surface water connection** to adjacent properties or **any body of water**, and the property to the immediate north is isolated by a retention pond. Furthermore, the drainage ditch along Donner Road prevents a discharge of water both to and from the site, and the Sutherland–Oemig drain is bermed, which prevents the discharge of water either into it or from the drain.

(*Id.* at 11)(emphasis added).

A final Determination and Order embodying the proposed decision was issued on September 30, 1998. (MDEQ Final Determination and Order, 9/30/99). This order mandated that the Carabells be granted a permit allowing them to develop the property according to their alternative plan.

### C. Intervention by the EPA and Corps.

In November 1998, acting pursuant to 33 U.S.C. § 1344, the EPA notified the MDEQ that it objected to the issuance of the permit to Plaintiffs, and it asserted federal jurisdiction over the case on the ground that the property was a wetland that was adjacent to the navigable waters of the United States. Also pursuant to § 1344, the EPA authorized the Corps to determine whether a federal permit should issue to allow the proposed development. Although the Carabells contested federal jurisdiction, they nevertheless submitted a permit application to the Corps.

The Corps initially conducted a Permit Evaluation, which was based upon three site inspections. (Department of Army Permit Evaluation, 9/11/2000). In the Permit Evaluation, the Corps found that the property must be part of the Lake St. Clair watershed because other property in a roughly similar location was a part of the watershed. In the words of the Permit Evaluation: "[d]ue to the fact that the influence of Lake St. Clair has been documented on the nearby Salt River over a mile up the reaches of the river (to 23 Mile Road), it is likely that the same influence is realized on the Auvase Creek, and continuing up the Sutherland–Oemig Drain that distance in the landscape, as well." (*Id.* at 6)(emphasis added). The Permit Evaluation also noted that the drainage ditch along the hypotenuse of the property drained into the Sutherland–Oemig Drain, but, in making this finding, the Corps did not cite any particular observation or other evidence. (*Id.*). The finding seems to be based upon its assessment of the probability that the property was part of the Lake St. Clair watershed.

Indeed, the speculative character of the Corps's entire fact-finding is confirmed by its description of the relationship of the property to the tributary system of Lake St. Clair. According to the Corps, the "ditch ... along the southeast portion of the property" runs into the Sutherland–Oemig Drain, which runs into Auvase Creek, which runs into Lake St. Clair. (*Id.*). This is simply a factual error. The "ditch ... along the southeast portion of the property" is the Sutherland–Oemig Drain. This error demonstrates the haphazardness of the Corps's own factual inquiry.

The Corps denied that application on October 5, 2000. (Letter from Lt. Col. Richard J. Polo, 10/5/2000 ("Decision Letter")). In this Decision Letter to the Carabells, the Corps's District Engineer, Lt. Col. Richard J. Polo, Jr., noted that the property was a valuable seasonal habitat for aquatic organisms and a year-round habitat for terrestrial organisms and that the property "provides water storage functions that, if destroyed, could result in an increased risk of erosion and degradation of water quality in the Sutherland–Oemig

Drain, Auvase Creek, and Lake St. Clair." (*Id.* at 1) In an accompanying Memorandum for the Record, Lt. Colo. Polo found that projects like the one proposed by the Carabells were "resulting in increases in flood duration and frequency and a contribution to the degradation of water quality in the Lake St. Clair watershed." (Memorandum for the Record at 1). This impact on the water quality of the Lake St. Clair watershed was a crucial factor in Lt. Col. Polo's assessment of the public interests associated with the project. (*Id.* at 2).

In light of these characteristics of the property and in light of the Corps's assessment of the relative public and private interests, the decision letter concluded that it was necessary for the Carabells to identify feasible alternatives, such as the use of different parcels of upland property for the development or the changed use of the property to make the maximum possible use of the upland along Donner Road. (Decision Letter at 2). Whether or not such alternatives were feasible, Lt. Col. Polo concluded that the Carabells would have to mitigate any development of the property by providing "the complete functional replacement of the forested wetlands" on the property. (Decision Letter at 2).

On December 1, 2000, the Carabells submitted a request for an appeal to the Corps. (Request for Appeal). They argued that the Corps did not have jurisdiction over the property, that the MDEQ's decision to grant a permit precluded any action by any federal agency, and that the Corps erred in the merits of its decision. A Corps hearing officer conducted a brief visit to the property on January 30, 2001, and, later that day, conducted a hearing on the Carabells' appeal.

At the hearing, the Corps asserted that its jurisdiction was derived from § 1344 and 33 C.F.R. § 328.3(a) because the property was a wetland that was adjacent to the waters of the United States. (Transcript of 1/30/2001 at 18–19). The Corps disclaimed jurisdiction under any other statute, including the migratory bird act. (*Id.*). In discussing the factual basis for federal jurisdiction, the Corps evaded an inquiry into whether the property was part of the Lake St. Clair watershed:

> MR. STOEPKER: The question I have is can you cite to me where it says natural tributary system in the rules or statutes? I'm aware it says navigable. We were there today and there is nothing navigable here. A sailboat could not move up and navigate this. Does the drain flow north or south based upon the changes? Does it, in fact, flow into Lake St. Clair?
>
> MS. CHUBB: [the Corps' Administrative Appeal Officer]: I think that is a separate question that will probably be answered in the appeal decision.
>
> MR. STOEPKER: I guess my question to you, Mr. Guathier, where does it say tributary?
>
> MS. CHUBB: Tributary to the navigable water, is that what you're asking?
>
> MR. STOEPKER: Right.
>
> MS. CHUBB: That is really a question for the division. It is not a question for the district. It may end up that way, but initially this is a division process.

(*Id.* at 20–21). Following in their pattern of avoidance, both the administrative hearing officer and the Army Corps evaded questions regarding the substantial effect of the Sutherland–Oemig Drain of the Carabell wetlands on interstate commerce, as neither would answer the questions posed by the Carabell's counsel:

> MR. STOEPKER: Okay. I'm looking at a section of the regulations where it talks about interstate wetlands. All other water such as interstate lakes, rivers, streams, including intermittent

streams, wetlands mud flats, sand flats, then which could effect interstate or foreign commerce, including such waters which are or could be used by interstate or foreign travelers for interstate or other purposes from which fishing or shellfish could or would be taken from interstate commerce.

Does anybody find any shellfish within the Oemig Drain? Are any fish at all in the interstate commerce, is that the position you're taking? The next qualification—I mean is that answer yes or no? I need to know.

MS. CHUBB: This is not an inquisition here. It is more of your presentation. Their record stands alone as it currently is. Whatever is in here is their position. That is the best they can do at this time.

(*Id.* at 21). These passages demonstrate that the Corps had no meaningful evidence to establish the directional flow of the Sutherland–Oemig Drain, its navigability, or its effect on interstate commerce.

The Corps denied the Carabells' appeal on March 5, 2001. In the Administrative Appeal Decision, the Corps continued to avoid making a conclusive finding regarding the connection between the property and the Lake St. Clair watershed. The Decision acknowledged that there was evidence directly contradicting the Permit Evaluation's findings regarding the flow of the Sutherland–Oemig Drain. Indeed, the Decision acknowledged that the Corps itself had not made a conclusive finding:

One confusing aspect of the ditch is the direction of water flow. The appellant's wetland consultant believed it flowed in a southwesterly direction away from the Sutherland–Oemig Drain while the District project manager (PM) observed

it flowing northeasterly during a site visit. The PM remarked during the appeal site visit that he thought the drainage was more "feathery" (diffuse, less defined) to the southwest. A review of the spot elevations on Sheet 1 of the appellant's grading plan, dated 12 August 1999, **does not clarify the issue**.

(Administrative Appeal Decision at 3). Moreover, the Decision rejected the idea that facts about the influence of Lake St. Clair on the Salt River could have any bearing on the question whether the property was part of the Lake St. Clair watershed:

This District suggests that Section 10 jurisdiction from Lake St. Clair may extend upstream on its tributaries (Auvase Creek and the Sutherland–Oemig Drain) to 23–Mile Road as it does on the Salt River, an established federally navigable water. **The administrative record does not support this statement.**

(*Id.*).(emphasis added). Notwithstanding all of this uncertainty, the Decision concluded that the property was part of the watershed and was within federal jurisdiction because "the appellant has not presented any information to refute the District's evaluation." (*Id.* at 2–3).

The Decision also cursorily rejected the Carabells' arguments regarding the preclusion of federal agency action and the merits of the Corps' decision. In particular, the Decision's ruling regarding the merits of the permit application was derivative of its jurisdictional ruling. Because the property was identified as part of the Lake St. Clair watershed, the Decision regarded Lt. Col. Polo's evaluation of the merits of the application as correct.[2]

2. Plaintiff's Statement of Facts is taken verbatim from their Motion for Summary Judgment, pages 2–9.

## III. *DEFENDANT'S STATEMENT OF FACTS*

### A. Description of the Property

The property at issue contains one of the last remaining large forested wetlands in the whole of Macomb County. AR Vol. 1, Doc. 55. at 13; Doc. 75. The Corps determined in the permitting process that building in these wetlands would have a major, long term detrimental impact on water quality, terrestrial biota, wetlands, conversation and overall ecology, and would permanently destroy the forested wetlands on the property. AR Vol. 1, Doc. 55, at 10, 14, 15, 16 and 21. *See also* Does. 75, 76 and 89.

The property is located approximately one mile from the shoreline of Lake St. Clair and consists of approximately 19.6 acres, of which 15.96 acres were delineated as wetland by the Carabells in their permit application. *See* AR Vol. 1, Doc. 2 and Doc. 55, at 6. The Corps' inspection of the property confirmed that the property contains mostly forested wetlands. AR Vol. 1, Doc. 55, at 6; Doc. 70, at 1–2. These wetlands are the prehistoric remnant of Lake St. Clair. AR Vol. 1, Doc. 55, at 5. The property is triangular shaped and a ditch has been excavated along the southeast portion of the property (the hypotenuse of the triangle). AR Vol. 1, Doc. 55, at 6. This unnamed ditch runs into the Sutherland–Oemig Drain ("Drain") at the northeastern corner of the property.[3] The Drain empties into Auvase Creek which flows into Lake St. Clair, *Id.*; AR Vol. 1,

Doc. 71. These drainage patterns were derived by the Corps based in part on the Corps' analysis of the United States Geological Survey's topographical quadrangle for New Haven, Michigan, which showed elevation contour lines descending down the Drain past the subject property to the point where the Drain and Harms Drain combine to form Auvase Creek, which is a connecting water with Lake St. Clair. *See* USGS Quadrangle Map for New Haven, Michigan cited at AR Vol. 1, Doc. 55, at 27.

The property contains a berm that runs along both sides of the ditch. The man-made berm was created from sidecast spoil as a result of the construction of the ditch. *Id.* at 7. The ditch appears to have been dug in wetland. AR Vol. 1, Doc. 89, at 2–3.

### B. The Corps' Determination of Regulatory Jurisdiction

The Corps' Statement of Findings concerning the Carabell application based regulatory jurisdiction over the subject wetlands on the fact that the wetlands are "adjacent to a drain which empties directly into [Lake St Clair], a Section 10 water."[4] AR Vol. 1, Doc. 75, at 1. The District Project Manager documented the adjacency of the wetlands to the Drain during his site inspection on May 5, 2000. AR Vol. 1, Doc. 71.

Moreover, in the course of the appeal of the permit denial to the Corps' Great Lakes and Ohio River Division ("Divi-

---

**3.** The Plaintiffs in their brief seem to have confused the unnamed ditch with the Sutherland–Oemig Drain. *See, e.g.,* Carabell Brief at 2–3; 5–6. There are, in fact, *two* bodies of water, and the wetlands are adjacent to both. The unnamed ditch runs along the hypotenuse of the triangular-shaped property and is part of the property. It connects to the Sutherland–Oemig Drain, which passes by the northeast corner of the property on its way to Auvase Creek.

**4.** The Corps also administers Section 10 of the 1899 Rivers and Harbors Act for structures or work in or affecting "navigable waters of the United States." These are waters that are, have been, or are susceptible for use to transport interstate or foreign commerce. 33 C.F.R. § 329.4. The Corps is required to keep a listing of such waters (33 C.F.R. § 329.16) and Lake St. Clair appears on this list.

sion"), the Division found that the Carabell wetlands are also adjacent to the unnamed ditch. AR Vol. 1, Doc. 89, at 2–3. Thus, the wetlands are adjacent to both the Drain and the unnamed ditch.[5]

### C. The Carabells' Application to the Corps for a Permit

On August 23, 1999, the Corps received a permit application from the Carabells.[6] AR Vol. 1, Doc. 2. The Carabells proposed to discharge approximately 57,500 cubic yards of material within a 15.97 acre wetland area for construction of a 112–unit townhouse condominium development. AR Vol. 1, Doc 55, atl. As mitigation, the Carabells proposed to dredge and replant 3.74 acres of the remaining wetlands on the parcel. *Id.*

The Corps conducted three site inspections on the property. The first inspection occurred on October 12, 1999, for permit evaluation purposes; the second on May 5, 2000, for migratory bird use documentation; and the third on August 1, 2000, to determine if the area contained Indiana Bat habitat. *Id.* at 6; AR Vol. 1, Docs. 70, 71, 72. The report summarizing the findings of the May 5, 2000 inspection included a determination of adjacency to the Sutherland–Oemig Drain and stated that the Drain flowed continuously into Auvase Creek which flows into Lake St. Clair. AR Vol. 1, Doc. 71; *see also* AR Vol. 1, Doc. 76, at 6.

On February 8, 2000, the Corps issued a Joint Public Notice for the proposed development. AR Vol. 1, Doc. 56. EPA, USFWS, the Macomb County Prosecutor's Office and the Lake St. Clair Advisory Committee all strongly objected to the proposed development. AR Vol. 1, Docs. 16, 17, 19, and 11, respectively. The USFWS specifically noted that wetlands of the type at issue here "are becoming increasingly scarce" (AR Vol. 1, Doc. 17) as did the Macomb County Prosecutor's Office ("[t]his parcel is one of the last remaining sizeable areas of forested wetland in Chesterfield Township.") AR Vol. 1, Doc. 19.

The Corps prepared a 27–page Permit Evaluation dated September 11, 2000, which consisted of the Corps' Environmental Assessment, Public Interest review summary, and factual and compliance determinations according to the 404(b)(1) guidelines. AR Vol. 1, Doc. 55. On October 5, 2000, the Corps sent the Carabells a letter denying the permit and enclosing the Corps' Statement of Findings as well as a copy of the September 11, 2000 Permit Evaluation. AR Vol. 1, Doc. 76. The denial letter stated in part:

> Your parcel is primarily a forested wetland that provides valuable seasonal habitat for aquatic organisms and year around habitat for terrestrial organisms. Additionally, the site provides water storage functions that, if destroyed, could result in an increased risk of ero-

---

**5.** The District has also based jurisdiction on the Commerce Clause because of the presence of migratory birds on the property. Due to the decision in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* ("*SWANCC*"), 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), this basis of jurisdiction is no longer applicable.

**6.** In 1987, the Carabells originally applied to the Michigan Department of Environmental Quality, ("MDEQ") for a permit to discharge

fill material on the property for construction of a 200 unit condominium complex. However, the history and findings of the state proceedings are immaterial to this action, which is entirely based upon the administrative record established after EPA sustained their objections to the issuance of a State permit and Section 404 permit authority was transferred from the State to the Corps pursuant to CWA Section 404(j) and 40 C.F.R. § 233.50(j). AR Vol. 1, Doc. 89, at 1.

sion and degradation of water quality in the Sutherland–Oemig Drain, Auvase Creek, and Lake St. Clair. The minimization of impacts to these wetlands is important for conservation and the overall ecology of the region. Because the project development area is a forested wetland, the proposed project would destroy the resources in such a manner that they would not soon recover from impacts of the discharges. The extent of impacts in the project area when considered both individually and cumulatively would be unacceptable and contrary to the public interest.

AR Vol. 1, Doc. 76, at 1.

In addition to its determination that the proposed project was contrary to the public interest, the Corps' decision to deny the permit was also based upon the presumption in the 404(b)(1) guidelines that there are less damaging practicable alternatives available. *Id.* at 1–2. The Carabells did not overcome that presumption and, therefore, the project did not comply with the guidelines. *Id.*

### D. The Carabells' Administrative Appeal of the Permit Denial

In a letter dated December 1, 2000, the Carabells appealed the Corps' denial of their permit application to the Division. The Carabells alleged that: (1) the Corps did not have regulatory jurisdiction over the wetlands; (2) the Corps was barred by *res judicata* (based on the prior holding in the State administrative appeal of the permit denial by MDEQ and MDEQ's subsequent issuance of a permit) from denying the permit; and (3) the Carabells had demonstrated that the permit was issuable under the applicable laws and regulations. AR Vol. 1, Doc. 80.

On the jurisdictional issue, the Carabells argued that the wetlands are isolated and, therefore, based on the decision in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* (*"SWANCC"*), 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), the Corps lacks regulatory jurisdiction.[7] AR Vol. 1, Doc. 89, at 2.

As part of the appeal process, the Division conducted an additional site inspection on January 30, 2001, which was documented by the Detroit District project manager. AR Vol. 1, Doc. 86. The participants in the site visit discussed the direction of the flow of the unnamed ditch. Mr. Leighton, the Carabells' consultant, believed that the ditch flowed southwest (away from the Sutherland–Oemig Drain). Mr. Deroche, the District project manager, stated that, in a previous site inspection, he had observed the ditch flowing northeast towards the Drain. AR Vol. 1, Docs. 87, 89.

On January 30, 2001, after the site visit, an appeal conference with the parties was held. The conference was transcribed (*see* AR Vol. 2, Doc. 9) and summarized in writing by the Appeal Review Officer. AR Vol. 2, Doc. 10.

On March 5, 2001, the Division issued its decision and found that the three issues for appeal presented by the Carabells lacked merit. AR Vol. 1, Doc. 89, at 5. First, the Division found that *SWANCC* was not relevant because the wetlands were not isolated. *Id.* at 3. Rather, the Division found that the wetlands are adjacent "to a surface tributary system of a navigable waterway, Lake St. Clair." *Id.* at 1. In particular, the Division found that:

---

**7.** *SWANCC* was decided on January 9, 2001, subsequent to the October 5, 2000 permit denial.

[T]he project manager observed that the onsite county ditch flowed into the Sutherland–Oemig Drain, which flows into Auvase Creek, which outlets into Lake St. Clair. The ditch appears to have been excavated in wetland based upon the adjoining onsite wetlands and the identification of poorly drained hydric soils .... The appellant's wetland consultant delineated the ditch as wetland. Spoil material from the excavated ditch was sidecast into berms on both sides of the ditch. However, the man-made spoil berm that separates the wetland from the ditch does not exclude adjacency as described above.

*Id.* at 2–3.

The Division further found that the Carabells had not presented any information to refute this finding. *Id.* at 3.

Second, the Division also determined that *res judicata* was not a legal principle applicable to the appeal and did not bar the Corps from deciding against the Carabells. *Id.* at 4.

Finally, the Division determined that the District completed a fair and reasonable review of the Carabells' application in accordance with all applicable laws and regulations. *Id.* at 2. Specifically, the Division found that the Carabells had not met their burden under the 404(b)(1) guidelines because they had not demonstrated that their proposal was the least environmentally damaging practicable alternative, and had not adequately demonstrated avoidance and minimization of aquatic impacts. *Id.* at 4, 5.

This appeal followed.

## IV. *STANDARD OF REVIEW*

 Judicial review of the decision of the COE is governed by the Administrative Procedure Act ("APA"). The APA provides that a court shall set aside agency "findings, conclusions, and actions" that are "arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The party asserting the challenge to the agency's actions bears the burden of demonstrating that these actions were arbitrary, capricious, or otherwise not in accordance with the law. *See Sierra Club v. Marita,* 46 F.3d 606, 616 (7th Cir.1995). The standard of review is highly deferential and the final agency action is "entitled to a presumption of regularity." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The scope of judicial review "is narrow and the court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The reviewing court must carefully "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. The reviewing courts duty is to hold the agency to "certain minimal standards of rationality" and is not to inject its opinion in place of that of the agency who, because of its expertise has been entrusted with the decision making power. *Ethyl Corp. v. EPA,* 541 F.2d 1, 36 (D.C.Cir.) cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

 The court is not to serve as a "rubber stamp" to the agency's decision. *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n.,* 59 F.3d 284, 290 (1st Cir.1995). The "agency must have examined the relevant data and have articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of United States, Inc.,* 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck*

*Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962)). The agency may not rely on post-hoc rationalizations or justifications in support of its decisions. *Id.* Nor "ignore evidence placed before it by interested parties." *Consumers Union of U.S., Inc. v. Consumer Product Safety Commission,* 491 F.2d 810, 812 (2nd Cir.1974). If the agency's determination cannot be sustained based upon the record, then it must be remanded for further consideration. *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

It is within this narrow scope of review that the motions for summary judgment must be decided. Under Fed.R.Civ.P. 56(e), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." In essence, Rule 56(e) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–1211 (6th Cir.1984). However, the Court is not permitted to judge the evidence or make findings of fact. *Ivy Street Corporation v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. This burden may be discharged by showing there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party discharges this burden, it then shifts to the nonmoving party to present specific facts showing a genuine triable issue. Fed. R.Civ.P, 56(e). To create a genuine issue of material fact, the nonmoving party must produce evidence sufficient to require submission of the issue to a jury. *Lucas v. Leaseway Multi Transp. Serv. Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990).

## V. *DISCUSSION*

■ Plaintiff contends that the COE has no jurisdiction over the property because it is an isolated wetland that is unconnected to any navigable waters of the United States or to any tributary or watershed of such waters.

Plaintiff argues that the COE must establish that the Sutherland–Oemig Drain is navigable or that the Drain is a tributary of the waters of the United States to establish jurisdiction. Plaintiff claims that the Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. United States Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001)("SWANCC") reaffirmed that the scope of the Clean Water Act ("CWA") and its attendant regulations is limited to the waters and wetlands that have some tangible connection to the navigable waters of the United States. Plaintiff asserts that the CWA only applies to bodies of water of the United States by surface water connections, ground water connections, or both.

The Defendants argue that both the unnamed Ditch and the Sutherland–Oemig Drain are tributaries under 33 C.F.R. § 328.3(a)(5), and contend that SWANCC is not applicable because Plaintiff's property is not isolated, and contends that SWANCC does not hold that a direct hy-

drological connection is required to establish jurisdiction based on adjacency. Section 404(a) of the CWA, 86 Stat.884, as amended, 33 U.S.C. § 1344(a), regulates the discharge of dredged or fill material into "navigable waters." The statute defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7) (2002).

The COE's definition of waters of the United States is found 33 C.F.3. § 328.3:

(a) The term "waters of the United States" means

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1)-(4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1)-(6) of this section.

Prior to SWANCC, a majority of courts held that the jurisdiction of the CWA extended to wetlands which were adjacent to non-navigable tributaries which flowed into navigable waters. *See United States v. Pozsgai*, 999 F.2d 719 (3rd Cir.1993); *Quivira Mining Co. v. EPA*, 765 F.2d 126 (10th Cir.1985) cert. denied, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *United States v. TGR Corp.*, 171 F.3d 762 (2nd Cir.1999); *United States v. Ashland Oil and Transportation Co.*, 504 F.2d 1317 (6th Cir.1974).

In January of 2001, the Supreme Court issued its decision in SWANCC. SWANCC involved a consortium of twenty-three suburban Chicago cities and villages that purchased an abandoned mining site to use for disposal of baled nonhazardous solid waste. Because the site required the filling of permanent and seasonal ponds which existed on the property, a request was made of the COE to determine whether a landfill permit was required under § 404(a) of the CWA, 33 U.S.C. § 1344(a). The COE determined that the site qualified as 'waters of the United States' and asserted jurisdiction under the Migratory Bird Rule, 51 Fed. Reg. 41217 (1986), and denied SWANCC a § 404(a) permit. SWANCC sued the COE arguing that the COE had exceeded their statutory authority in interpreting the CWA to cover non-navigable, isolated, intrastate waters based upon the presence of migratory birds.

The Supreme Court held that 33 C.F.R. § 328.3(a)(3) (1999), as clarified and applied to Plaintiff's balefill site pursuant to the 'Migratory Bird Rule,' 51 Fed.Reg. 41217 (1986), exceeds the authority granted to respondents under § 404(a) of the CWA.

In reaching its decision, the Court evaluated the meaning of § 404(a) and stated:

This is not the first time we have been called upon to evaluate the meaning of S 404(a). In *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), we held that the Corps had S 404(a) jurisdiction over wetlands that actually abutted on a navigable waterway. In so doing, we noted that the term "navigable" is of "limited import" and that Congress evidenced its intent to "regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Id.,* at 133, 106 S.Ct. 455. But our holding was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters. *See id.,* at 135–139, 106 S.Ct. 455. We found that Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetland "inseparably bound up with the 'waters' of the United States." *Id.,* at 134, 106 S.Ct. 455.

It was the significant nexus between the wetlands and "navigable waters" that informed our reading of the CWA in Riverside Bayview Homes. Indeed, we did not "express any opinion" on the "question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of open water ...." *Id.,* at 131–132, 106 S.Ct. 455.

In declining to extend its ruling in Riverside Bayview Homes, the Court stated:

We thus decline respondents' invitation to take what they see as the next ineluctable step after Riverside Bayview Homes: holding that isolated ponds, some only seasonal, wholly located within two Illinois counties, fall under S 404(a)'s definition of "navigable waters"

because they serve as habitat for migratory birds. As counsel for respondents conceded at oral argument, such a ruling would assume that "the use of the word navigable in the statute ... does not have any independent significant." Tr. of Oral Arg. 28. We cannot agree that Congress' separate definitional use of the phrase "waters of the United States" constitutes a basis for reading the term "navigable waters" out of the statute. We said in Riverside Bayview Homes that the word "navigable" in the statute was of "limited import." 474 U.S. at 133, 106 S.Ct. 455, 88 L.Ed.2d 419, and went on to hold that S 404(a) extended to non-navigable wetlands adjacent to open waters. But it is one thing to give a word limited effect and quite another to give it no effect whatever. The term "navigable" has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made. *See,* e.g., *United States v. Appalachian Elec. Power Co.,* 311 U.S. 377, 407–408, 61 S.Ct. 291, 85 L.Ed. 243 (1940).

The ruling in SWANCC created a split among courts as to how the ruling should be interpreted. Some courts have interpreted SWANCC to limit jurisdiction under the CWA. Courts adopting this interpretation take the position that a "body of water is subject to regulation under the CWA if the body of water is actually navigable or is adjacent to an open body of navigable water." *See Rice v. Harken Exploration Co.,* 250 F.3d 264, 269 (5th Cir. 2001); *United States v. Rapanos,* 190 F.Supp.2d 1011 (E.D. Mich.2002); *United States v. RGM Corporation,* 222 F.Supp.2d 780 (E.D.Va.2002); *United States v. Newdunn Associates,* 195 F.Supp.2d 751 (E.D.Va.2002).

Other courts maintain that SWANCC has not altered the jurisdiction of the CWA. They view the Court's ruling in SWANCC to be very narrow, and interpret SWANCC as applying only to isolated waters which have no hydrological connection to navigable waters. *See Headwaters, Inc. v. Talent Irrigation District,* 243 F.3d 526 (9th Cir.2001); *United States v. Interstate General Co.,* 152 F.Supp.2d 843 (D.Md.2001); *United States v. Buday,* 138 F.Supp.2d 1282 (D.Mont.2001); *United States v. Lamplight Equestrian Center, Inc.,* 2002 WL 360652 (N.D.Ill.2002).

Plaintiff urges the Court to adopt the interpretation of the Fifth Circuit and other courts which find that no jurisdiction exists under the CWA unless the body of water is actually navigable or adjacent to an open body of navigable water. I decline to do so because I am not convinced that Plaintiff's interpretation of SWANCC is correct. I am more persuaded by the reasoning of the courts which have concluded that the Court's ruling in SWANCC was narrow, and did not substantially narrow the jurisdiction of the COE under the CWA.

In *Lamplight Equestrian Center, Inc., Id.,* the Court summarized the rulings of a number of courts that declined to read SWANCC as a broad reduction of the COE's authority to regulate waters under the CWA. The Court determined that the critical issue which ran through this case was whether a nexus existed between the property and the relevant interstate water. The Court stated:

"This court finds the reasoning of the cases following *Headwaters* persuasive, and agrees with those courts that *SWANCC* did not effect so substantial a change in the Corps' jurisdiction." Much of the *SWANCC* opinion has no direct relevance here because that case involved isolated waters lacking a physical/hydrological connection to other navi-

gable waters. The *SWANCC* decision acknowledged that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the [Act] in *Riverside Bayview Homes*." *SWANCC,* 531 U.S. at 167, 121 S.Ct. 675. Thus, in this court's view, the critical issue is whether there is a "significant nexus" between the Property's wetlands and the Fox River.

Plaintiffs' property in this case is not isolated. It is undisputed that the property is adjacent to an unnamed ditch, and that the ditch connects to the Sutherland–Oemig Drain. (Tr. 55–61). The Drain, which neighbors a corner of the property, connects to Lake St. Clair. (Tr. 54).

The COE claims jurisdiction over the property because the Corps' definition of "waters of the United States" includes "wetland adjacent" to other categories of waters of the United States, including tributaries. 33 C.F.R. § 328.3(a)(7).

Plaintiff claims that both the ditch and the Drain are not tributaries because they are not navigable. Plaintiff also argues that there is insufficient evidence that the waters from the ditch flow into the drain, and therefore, the ditch cannot be a tributary. Plaintiffs' argument is not supported by the case law, including SWANCC.

In *United States v. Ashland Oil and Transportation,* 504 F.2d 1317 (6th Cir. 1974), the court held that Congress had constitutional authority under its interstate commerce powers to prohibit discharge of pollutants into non-navigable tributaries of navigable streams.

In *Headwaters, Inc., Id.,* the court quoted from the Eleventh Circuit's decision in *United States v. Eidson,* 108 F.3d 1336, 1342 (11th Cir.1997) in holding that ineqation canals were "waters of the United

States," and thus subject to the CWA. In *Eidson,* the court stated:

> "Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage. It makes no difference that a stream was or was not at the time of the spill discharging water continuously into a river navigable in a traditional sense. Rather, as long as the tributary would flow into the navigable body [under certain conditions], it is capable of spreading environmental damage and is thus a 'water of the United States' under the Act."

*Eidson,* 108 F.3d at 1342.

The court in *Headwaters, Inc., Id.,* listed other decisions reaching the same conclusions; *Driscoll v. Adams,* 181 F.3d 1285, 1291 (11th Cir.1999)(small volume stream running only intermittently is "navigable water"); *Quivira Mining Co. v. United States Envtl. Prot. Agency,* 765 F.2d 126, 130 (10th Cir.1985) (creeks and arroyos connected to streams during intense rainfall are "waters of the United States"); *United States v. Interstate Gen. Co.,* 152 F.Supp.2d 843, 847 (D.Md.2001)(describing SWANCC as a narrow holding "limited to the Migratory Bird Rule and not affecting regulations defining 'non-navigable tributaries and streams' as waters of the United States.").

Even the decision in SWANCC lends no support to Plaintiff's argument. In his dissenting opinion, Justice Stevens stated:

> "In its decision today, the Court draws a new jurisdictional line; one that invalidates the 1986 Migratory Bird regulation as well as the Corps' assertion of jurisdiction over all waters except for actually navigable waters, their tributaries, and wetlands adjacent to each."

*SWANCC,* 531 U.S. at 176, 121 S.Ct. 675.

He went on to state that:

> "Even if the majority were correct, that Congress did not extend the Corps' jurisdiction in the 1972 CWA to reach beyond navigable waters and their nonnavigable tributaries. Congress' rejection of the House's efforts in 1977 to cut back on the Corps' 1975 assertion of jurisdiction, clearly indicates congressional acquiescence in that assertion. *Id.,* at 184, 121 S.Ct. 675."

Justice Stevens also stated:

> "But the Court ignores the provisions legislative history, which makes clear that Congress understood § 404(g)(1)— and therefore, federal jurisdiction—to extend, not only to navigable waters and non-navigable tributaries, but also to 'isolated' waters, such as those at issue in this case." *Id.,* at 187, 121 S.Ct. 675.

It is clear from Justice Stevens dissent that the court was not negating the Corps' jurisdiction over non-navigable tributaries of navigable waters.

In *Riverside Bayview Homes, Inc.,* 474 U.S. at 134, 106 S.Ct. 455, the court stated:

> "In short, the Corps has concluded that wetlands adjacent to lakes, rivers, streams, and other bodies of water may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source on the adjacent bodies of water. Again, we cannot say that the Corps' judgment on these matters is unreasonable, and we therefore conclude that the definition of 'waters of the United States' encompassing all wetlands adjacent to other bodies of water over which the Corps has jurisdiction, is a permissible interpretation of the Act."

I conclude, therefore, that because Plaintiffs' property is adjacent to neigh-

boring tributaries of navigable waters and has a significant nexus to "waters of the United States," it is in fact not isolated, and is subject to the jurisdiction of the CWA. Plaintiffs' argument concerning the Commerce Clause, which is dependant on the property being isolated, therefore is not applicable.

■ Plaintiffs' final argument is that the COE erred in rejecting the application on the merits. Plaintiff argues that in denying the permit, the Corps emphasized that the property was an important part of the Lake St. Clair watershed and fulfilled important functions in drainage, filtering and flood control. Plaintiff maintains that the property does not fulfill any of those functions.

Plaintiff also argues that the mitigation proposed by the Plaintiffs as part of their application would actually promote the drainage and filtering functions more effectively than maintenance of the property in its current form.

Plaintiff also takes issue with the Corps' determination that Plaintiff confine the construction of the condominiums to the upland portion of the property, or establish why they cannot purchase an alternative parcel of land elsewhere in Macomb County. Plaintiff claims that the administrative record demonstrates that there is no appropriately zoned property available in Macomb County, and suggests that it is unfeasible to build a 112–unit condominium on less than four acres of upland on the property.

The COE made the following relevant findings in its permit evaluation of Plaintiff's property:

Shoreline Erosion and Accretion Effects:

The project would eliminate the potential ability of the wetland to act as a sediment catch basin. Increased runoff due to the filling of the wetlands and creation of impervious surfaces, i.e., condominiums, driveways, roads, etc., could increase erosion and/or sedimentation in the S–O Drain, Auvase Creek, and Lake St. Clair. The proposed deforestation and removal of two to three feet of wetland soils to create an emergent wetland within the 3.74 acres of remaining existing forested wetlands (the proposed mitigation) may provide some storm water retention; however, the storm water detention basin proposed for the center of the complex would empty into these significantly smaller areas, quickly overtopping them. These wetlands would then empty into the drain and most functions served by the existing forested wetlands would not be replaced. The project would contribute to increased runoff and would likely result in increased erosion and accretion along the drain and further downstream in Auvase Creek.

In summary, the project will have minor, long term, negative impacts on erosion/accretion. The cumulative impacts of numerous such projects would be major and negative as fewer and fewer wetlands remain in Chesterfield Township to function as sediment basins resulting in greater flooding events of local drains and streams thereby increasing erosion and/or accretion problems.

The negative impacts would be avoided if the permit were denied. A modified permit which minimized the fill area and offset runoff detention may decrease impacts to downstream erosion/accretion; however, when taking into consideration the cumulative impacts of similar activities which have occurred in this watershed, such a modified permit would require a significant reduction in the area of fill to reduce those impacts to a minor level.

Effects on Flood Hazards and Floodplain Values:

The proposed project would aid in the prevention of flooding for the applicant and authorization of such a project would encourage the applicant to invest in a parcel that shows evidence of flooding/standing water conditions. Because there is limited acreage remaining in the Chesterfield Township area which provides for storm water storage and delayed release of these waters, it is likely that the downstream areas will see an increase in possible flooding magnitude and frequency. This is due to the fact that there will be a net increase in runoff since the parcel is not currently a part of the S–O Drain watershed. Construction of the project and similar projects could have detriments to downstream residents.

The proposed deforestation and removal of two to three feet of wetland soils to create an emergent wetland within the 3.74 acres of remaining existing forested wetlands (the proposed mitigation) may provide some storm water retention; however, the storm water detention basin proposed for the center of the complex is proposed to empty into these significantly smaller areas, which will quickly exceed their storage capacity. These wetlands would then empty into the drain and the functions of water storage (from precipitation) served by the existing forested wetlands to would not be replaced (See drawing Pages 4–8 of Enclosure 1).

In summary, the project will have minor, short term and long term, negative impacts on flood hazards and floodplain values. The cumulative impacts of numerous such projects would be major and negative. The negative impacts

would be avoided if the permit were denied.

The applicant did not adequately address avoidance of wetlands, the first necessary sequence in the Section 404(b)(1) guidelines. As their alternative analysis, the applicant submitted contested case hearing transcripts indicating there is only one other parcel in Chesterfield Township zoned for multi-family development. They did not explain why they could not pursue use of this parcel. They also failed to address the availability of other upland parcels, the possibility of seeking and being granted zoning variances within the Township, the use of several smaller parcels instead of one large parcel, or change in design to fit the available zoning. This presumption must be overcome before moving to the second hurdle in the Guidelines.[8]

Section 404 of the CWA, authorizes the COE to issue a permit to allow discharge of dredged or fill materials into those waters governed by the Act. The Section 404 permit process is governed concurrently by COE guidelines, 33 C.F.R., Parts 320–329, and by EPA guidelines, 40 C.F.R. Part 230. *Friends of the Earth v. Hintz*, 800 F.2d 822 (9th Cir.1986).

Section 320.4 of 33 C.F.R. sets forth the general policies that guide the COE in its evaluation of the permit applications for fill activities. The regulations require the COE to conduct a public interest review, balancing the "benefits which reasonably may be expected to accrue from the proposal against the reasonably foreseeable detriments," with consideration for the "national concern for both protection and utilization of important resources." *Id.*, § 320.4(a)(1). A permit is to be granted

---

**8.** Taken verbatim from the Permit Evaluation, Administrative Record, Volume 2, Document 17, pgs. 10, 11, 23, and 24.

unless it is determined that issuance would be contrary to the public interest. *Id.*

A Section 404 Permit must comply with relevant EPA regulations. *Id.* EPA regulations provide that "no discharge of dredged or fill material shall be permitted if there is a practical alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

Under 40 C.F.R. § 230.10(a)(3), where the activity associated with a discharge which is proposed for a special aquatic site, does not require access or proximity to or sitting with the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependant"), practical alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the purposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem unless clearly demonstrated otherwise.

Plaintiffs' proposed condominium project is not water dependant, therefore, a practical alternative is presumed to be available. The administrative record establishes that Plaintiff never sought out, or investigated that site. Although Plaintiffs' witnesses' testified as to no other property available other than that parcel, not one witness testified that an investigation was undertaken to determine if the available parcel was a suitable alternative. The COE provided a rational basis for its decision regarding the possibility of a practical alternative, and I cannot conclude that the decision was arbitrary or capricious.

I also conclude that the COE provided a rational basis for their decisions concerning shoreline erosion and accretion effects, flood hazards, and floodplain values. The Court is reminded that it is not to substitute its own judgment for that of the agency; as long as the agency provides a rational explanation for its decision. *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416, 91 S.Ct. 814.

## VI. *CONCLUSION*

For the reasons stated above, it is respectfully recommended that Plaintiffs' Motion for Summary Judgment be **DENIED,** and the Defendants' Motion for Summary Judgment be **GRANTED**.

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of this recommendation that they may serve and file specific, written objections to the proposed findings and recommendations. Further, either party may respond to another party's objections within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

In accordance with the provisions of Rule 6(b) of the Federal Rules of Civil Procedure, the Court, in its discretion, may enlarge the period of time in which to file objections to the report.