*759 Justice Kennedy,
concurring in the judgment.
These consolidated cases require the Court to decide whether the term “navigable waters” in the Clean Water Act extends to wetlands that do not contain and are not adjacent to waters that are navigable in fact. In Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U. S. 159 (2001) (SWANCC), the Court held, under the circumstances presented there, that to constitute “ ‘navigable waters’ ” under the Act, a water or wetland must possess a “significant nexus” to waters that are or were navigable in fact or that could reasonably be so made. Id., at 167, 172. In the instant cases neither the plurality opinion nor the dissent by Justice Stevens chooses to apply this test; and though the Court of Appeals recognized the test’s applicability, it did not consider all the factors necessary to determine whether the lands in question had, or did not have, the requisite nexus. In my view the cases ought to be remanded to the Court of Appeals for proper consideration of the nexus requirement.
I
Although both the plurality opinion and the dissent by Justice Stevens (hereinafter the dissent) discuss the background of these cases in some detail, a further discussion of the relevant statutes, regulations, and facts may clarify the analysis suggested here.
A
The “objective” of the Clean Water Act (or Act) is “to restore and maintain the chemical, physical, and biological integrity of the Nation’s waters.” 33 U. S. C. § 1251(a). To *760 that end, the statute, among other things, prohibits “the discharge of any pollutant by any person” except as provided in the Act. § 1311(a). As relevant here, the term “discharge of a pollutant” means “any addition of any pollutant to navigable waters from any point source.” § 1362(12). The term “pollutant” is defined as “dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.” §1362(6). The Secretary of the Army, acting through the Chief of Engineers of the Army Corps of Engineers, may issue permits for “discharge of dredged or fill material into the navigable waters at specified disposal sites.” §§ 1344(a), (c), (d); but see § 1344(f) (categorically exempting certain forms of “discharge of dredged or fill material” from regulation under § 1311(a)). Pursuant to § 1344(g), States with qualifying programs may assume certain aspects of the Corps’ permitting responsibility. Apart from dredged or fill material, pollutant discharges require a permit from the Environmental Protection Agency (EPA), which also oversees the Corps’ (and qualifying States’) permitting decisions. See §§ 1311(a), 1342(a), 1344(c). Discharge of pollutants without an appropriate permit may result in civil or criminal liability. See § 1319.
The statutory term to be interpreted and applied in the two instant cases is the term “navigable waters.” The outcome turns on whether that phrase reasonably describes certain Michigan wetlands the Corps seeks to regulate. Under the Act “[t]he term ‘navigable waters’ means the waters of the United States, including the territorial seas.” § 1362(7). In a regulation the Corps has construed the term “waters of the United States” to include not only waters susceptible to use in interstate commerce — the traditional understanding of the term “navigable waters of the United States,” see, e. g., United States v. Appalachian Elec. Power Co., 311 U. S. *761 377, 406-408 (1940); The Daniel Ball, 10 Wall. 557, 563-564 (1871) — but also tributaries of those waters and, of particular relevance here, wetlands adjacent to those waters or their tributaries. 33 CFR §§ 328.3(a)(1), (5), (7) (2005). The Corps views tributaries as within its jurisdiction if they carry a perceptible “ordinary high water mark.” § 328.4(c); 65 Fed. Reg. 12823 (2000). An ordinary high-water mark is a “line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.” 33 CFR § 328.3(e).
Contrary to the plurality’s description, ante, at 722, 734, wetlands are not simply moist patches of earth. They are defined as “those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.” § 328.3(b). The Corps’ Wetlands Delineation Manual, including over 100 pages of technical guidance for Corps officers, interprets this definition of wetlands to require: (1) prevalence of plant species typically adapted to saturated soil conditions, determined in accordance with the United States Fish and Wildlife Service’s National List of Plant Species that Occur in Wetlands; (2) hydric soil, meaning soil that is saturated, flooded, or ponded for sufficient time during the growing season to become anaerobic, or lacking in oxygen, in the upper part; and (3) wetland hydrology, a term generally requiring continuous inundation or saturation to the surface during at least five percent of the growing season in most years. See Wetlands Research Program Technical Report Y-87-1 (online edition), pp. 12-34 (Jan. 1987), http://www.saj .usace. *762 army.mil/permit/documents/87manual.pdf (all Internet materials as visited June 16, 2006, and available in Clerk of Court’s case file). Under the Corps’ regulations, wetlands are adjacent to tributaries, and thus covered by the Act, even if they are “separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like.” § 328.3(c).
B
The first consolidated case before the Court, Rapanos v. United States, No. 04-1034, relates to a civil enforcement action initiated by the United States in the United States District Court for the Eastern District of Michigan against the owners of three land parcels near Midland, Michigan. The first parcel, known as the Salzburg site, consists of roughly 230 acres. The District Court, applying the Corps’ definition of wetlands, found based on expert testimony that the Salzburg site included 28 acres of wetlands. The District Court further found that “the Salzburg wetlands have a surface water connection to tributaries of the Kawkawlin River which, in turn, flows into the Saginaw River and ultimately into Lake Huron.” App. to Pet. for Cert. Bll. Water from the site evidently spills into the Hoppler Drain, located just north of the property, which carries water into the Hoppler Creek and thence into the Kawkawlin River, which is navigable. A state official testified that he observed carp spawning in a ditch just north of the property, indicating a direct surface-water connection from the ditch to the Saginaw Bay of Lake Huron.
The second parcel, known as the Hines Road site, consists of 275 acres, which the District Court found included 64 acres of wetlands. The court found that the wetlands have a surface-water connection to the Rose Drain, which carries water into the Tittabawassee River, a navigable waterway. The final parcel, called the Pine River site, consists of some 200 acres. The District Court found that 49 acres were wet *763 lands and that a surface-water connection linked the wetlands to the nearby Pine River, which flows into Lake Huron.
At all relevant times, John Rapanos owned the Salzburg site; a company he controlled owned the Hines Road site; and Rapanos’ wife and a company she controlled (possibly in connection with another entity) owned the Pine River site. All these parties are petitioners here. In December 1988, Mr. Rapanos, hoping to construct a shopping center, asked the Michigan Department of Natural Resources to inspect the Salzburg site. A state official informed Rapanos that while the site likely included regulated wetlands, Rapanos could proceed with the project if the wetlands were delineated (that is, identified and preserved) or if a permit were obtained. Pursuing the delineation option, Rapanos hired a wetlands consultant to survey the property. The results evidently displeased Rapanos: Informed that the site included between 48 and 58 acres of wetlands, Rapanos allegedly threatened to “destroy” the consultant unless he eradicated all traces of his report. Rapanos then ordered $350,000-worth of earthmoving and landclearing work that filled in 22 of the 64 wetlands acres on the Salzburg site. He did so without a permit and despite receiving cease-and-desist orders from state officials and the EPA. At the Hines Road and Pine River sites, construction work — again conducted in violation of state and federal compliance orders— altered an additional 17 and 15 wetlands acres, respectively.
The Federal Government brought criminal charges against Rapanos. In the suit at issue here, however, the United States alleged civil violations of the Clean Water Act against all the Rapanos petitioners. Specifically, the Government claimed that petitioners discharged fill into jurisdictional wetlands, failed to respond to requests for information, and ignored administrative compliance orders. See 33 U. S. C. §§ 1311(a), 1318(a), 1319(a). After a 13-day bench trial, the District Court made the findings noted earlier and, on that basis, upheld the Corps’ jurisdiction over wetlands on the *764 three parcels. On the merits the court ruled in the Government’s favor, finding that violations occurred at all three sites. As to two other sites, however, the court rejected the Corps’ claim to jurisdiction, holding that the Government had failed to carry its burden of proving the existence of wetlands under the three-part regulatory definition. (These two parcels are no longer at issue.) The United States Court of Appeals for the Sixth Circuit affirmed. 376 F. 3d 629, 634 (2004). This Court granted certiorari to consider the Corps’ jurisdiction over wetlands on the Salzburg, Hines Road, and Pine River sites. 546 U. S. 932 (2005).
The second consolidated case, Carabell, No. 04-1384, involves a parcel shaped like a right triangle and consisting of some 19.6 acres, 15.9 of which are forested wetlands. 257 F. Supp. 2d 917, 923 (ED Mich. 2003). The property is located roughly one mile from Lake St. Clair, a 430-square-mile lake located between Michigan and Canada that is popular for boating and fishing and produces some 48 percent of the sport fish caught in the Great Lakes, see Brief for Ma-comb County, Michigan, as Amicus Curiae 2. The right-angle corner of the property is located to the northwest. The hypotenuse, which runs from northeast to southwest, lies alongside a man-made berm that separates the property from a ditch. At least under current conditions — that is, without the deposit of fill in the wetlands that the landowners propose — the berm ordinarily, if not always, blocks surface-water flow from the wetlands into the ditch. But cf. App. 186a (administrative hearing testimony by consultant for Carabells indicating “you would start seeing some overflow” in a “ten year storm”). Near the northeast corner of the property, the ditch connects with the SutherlandOemig Drain, which carries water continuously throughout the year and empties into Auvase Creek. The creek in turn empties into Lake St. Clair. At its southwest end, the ditch connects to other ditches that empty into the Auvase Creek and thence into Lake St. Clair.
*765 In 1993 petitioners Keith and June Carabell sought a permit from the Michigan Department of Environmental Quality (MDEQ), which has assumed permitting functions of the Corps pursuant to § 1344(g). Petitioners hoped to fill in the wetlands and construct 130 condominium units. Although the MDEQ denied the permit, a State Administrative Law Judge directed the agency to approve an alternative plan, proposed by the Carabells, that involved the construction of 112 units. This proposal called for filling in 12.2 acres of the property while creating retention ponds on 3.74 acres. Because the EPA had objected to the permit, jurisdiction over the case transferred to the Corps. See § 1344(j).
The Corps’ district office concluded that the Carabells’ property “provides water storage functions that, if destroyed, could result in an increased risk of erosion and degradation of water quality in the Sutherland-Oemig Drain, Auvase Creek, and Lake St. Clair.” Id., at 127a. The district office denied the permit, and the Corps upheld the denial in an administrative appeal. The Carabells, challenging both the Corps’ jurisdiction and the merits of the permit denial, sought judicial review pursuant to the Administrative Procedure Act, 5 U.S.C. §706(2)(A). The United States District Court for the Eastern District of Michigan granted summary judgment to the Corps, 257 F. Supp. 2d 917 (2003), and the United States Court of Appeals for the Sixth Circuit affirmed, 391 F. 3d 704 (2004). This Court granted certiorari to consider the jurisdictional question. 546 U. S. 932 (2005).
II
Twice before the Court has construed the term “navigable waters” in the Clean Water Act. In United States v. Riverside Bayview Homes, Inc., 474 U. S. 121 (1985), the Court upheld the Corps’ jurisdiction over wetlands adjacent to navigable-in-fact waterways. Id., at 139. The property in Riverside Bayview, like the wetlands in the Carabell case now before the Court, was located roughly one mile from *766 Lake St. Clair, see United States v. Riverside Bayview Homes, Inc., 729 F. 2d 391, 392 (CA6 1984) (decision on review in Riverside Bayview), though in that case, unlike Carabell, the lands at issue formed part of a wetland that directly abutted a navigable-in-fact creek, 474 U. S., at 131. In regulatory provisions that remain in effect, the Corps had concluded that wetlands perform important functions such as filtering and purifying water draining into adjacent water bodies, 33 CFR § 320.4(b)(2)(vii) (1985), slowing the flow of runoff into lakes, rivers, and streams so as to prevent flooding and erosion, §§320.4(b)(2)(iv), (v), and providing critical habitat for aquatic animal species, § 320.4(b)(2)(i). 474 U. S., at 134-135. Recognizing that “[a]n agency’s construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress,” id., at 131 (citing Chemical Mfrs. Assn. v. Natural Resources Defense Council, Inc., 470 U. S. 116, 125 (1985), and Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-845 (1984)), the Court held that “the Corps’ ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act,” 474 U. S., at 134. The Court reserved, however, the question of the Corps’ authority to regulate wetlands other than those adjacent to open waters. See id., at 131-132, n. 8.
In SWANCC, the Court considered the validity of the Corps’ jurisdiction over ponds and mudflats that were isolated in the sense of being unconnected to other waters covered by the Act. 531 U. S., at 171. The property at issue was an abandoned sand and gravel pit mining operation where “remnant excavation trenches” had “evolv[ed] into a scattering of permanent and seasonal ponds.” Id., at 163. Asserting jurisdiction pursuant to a regulation called the “Migratory Bird Rule,” the Corps argued that these isolated ponds were “waters of the United States” (and thus “naviga *767 ble waters” under the Act) because they were used as habitat by migratory birds. Id., at 164-165. The Court rejected this theory. “It was the significant nexus between wetlands and ‘navigable waters/ ” the Court held, “that informed our reading of the [Act] in Riverside Bayview Homes.” Id., at 167. Because such a nexus was lacking with respect to isolated ponds, the Court held that the plain text of the statute did not permit the Corps’ action. Id., at 172.
Riverside Bayview and SWANCC establish the framework for the inquiry in the cases now before the Court: Do the Corps’ regulations, as applied to the wetlands in Carabell and the three wetlands parcels in Rapanos, constitute a reasonable interpretation of “navigable waters” as in Riverside Bayview or an invalid construction as in SWANCC? Taken together these cases establish that in some instances, as exemplified by Riverside Bayview, the connection between a nonnavigable water or wetland and a navigable water may be so close, or potentially so close, that the Corps may deem the water or wetland a “navigable water” under the Act. In other instances, as exemplified by SWANCC, there may be little or no connection. Absent a significant nexus, jurisdiction under the Act is lacking. Because neither the plurality nor the dissent addresses the nexus requirement, this separate opinion, in my respectful view, is necessary.
A
The plurality’s opinion begins from a correct premise. As the plurality points out, and as Riverside Bayview holds, in enacting the Clean Water Act Congress intended to regulate at least some waters that are not navigable in the traditional sense. Ante, at 731; Riverside Bayview, supra, at 133; see also SWANCC, supra, at 167. This conclusion is supported by “the evident breadth of congressional concern for protection of water quality and aquatic ecosystems.” Riverside Bayview, supra, at 133; see also Milwaukee v. Illinois, 451 U. S. 304, 318 (1981) (describing the Act as “an all- *768 encompassing program of water pollution regulation”). It is further compelled by statutory text, for the text is explicit in extending the coverage of the Act to some nonnavigable waters. In a provision allowing States to assume some regulatory functions of the Corps (an option Michigan has exercised), the Act limits States to issuing permits for:
“the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their ordinary high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction.” 33 U. S. C. § 1344(g)(1).
Were there no Clean Water Act “navigable waters” apart from waters “presently used” or “susceptible to use” in interstate commerce, the “other than” clause, which begins the long parenthetical statement, would overtake the delegation of authority the provision makes at the outset. Congress, it follows, must have intended a broader meaning for navigable waters. The mention of wetlands in the “other than” clause, moreover, makes plain that at least some wetlands fall within the scope of the term “navigable waters.” See Riverside Bayview, supra, at 138-139, and n. 11.
From this reasonable beginning the plurality proceeds to impose two limitations on the Act; but these limitations, it is here submitted, are without support in the language and purposes of the Act or in our cases interpreting it. First, because the dictionary defines “waters” to mean “water ‘[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes,’ or ‘the flowing or moving masses, as of waves or floods, making up such streams or *769 bodies/ ” ante, at 732 (quoting Webster’s New International Dictionary 2882 (2d ed. 1954) (hereinafter Webster’s Second)), the plurality would conclude that the phrase “navigable waters” permits Corps and EPA jurisdiction only over “relatively permanent, standing or flowing bodies of water,” ante, at 732 — a category that in the plurality’s view includes “seasonal” rivers, that is, rivers that carry water continuously except during “dry months,” but not intermittent or ephemeral streams, ante, at 732-734, and n. 5. Second, the plurality asserts that wetlands fall within the Act only if they bear “a continuous surface connection to bodies that are 'waters of the United States’ in their own right” — waters, that is, that satisfy the plurality’s requirement of permanent standing water or continuous flow. Ante, at 742.
The plurality’s first requirement — permanent standing water or continuous flow, at least for a period of “some months,” ante, at 732-733, and n. 5 — makes little practical sense in a statute concerned with downstream water quality. The merest trickle, if continuous, would count as a “water” subject to federal regulation, while torrents thundering at irregular intervals through otherwise dry channels would not. Though the plurality seems to presume that such irregular flows are too insignificant to be of concern in a statute focused on “waters,” that may not always be true. Areas in the western parts of the Nation provide some examples. The Los Angeles River, for instance, ordinarily, carries only a trickle of water and often looks more like a dry roadway than a river. See, e. g., B. Gumprecht, The Los Angeles River: Its Life, Death, and Possible Rebirth 1-2 (1999); Martinez, City of Angels’ Signature River Tapped for Rebirth, Chicago Tribune, Apr. 10,2005, section 1, p. 8. Yet it periodically releases water volumes so powerful and destructive that it has been encased in concrete and steel over a length of some 50 miles. See Gumprecht, supra, at 227. Though this particular waterway might satisfy the plurality’s test, it is illustrative of what often-dry watercourses *770 can become when rain waters flow. See, e. g., County of Los Angeles Dept, of Public Works, Water Resources Division: 2002-2003 Hydrologic Report, Runoff, Daily Discharge, F377-R BOUQUET CANYON CREEK at Urban-dale Avenue 11107860 Bouquet Creek Near Saugus, CA, http://ladpw.org/wrd/report/0203/runoff/discharge.cfm (indicating creek carried no flow for much of the year but carried 122 cubic feet per second on Feb. 12, 2003).
To be sure, Congress could draw a line to exclude irregular waterways, but nothing in the statute suggests it has done so. Quite the opposite, a full reading of the dictionary definition precludes the plurality’s emphasis on permanence: The term “waters” may mean “flood or inundation,” Webster’s Second 2882, events that are impermanent by definition. Thus, although of course the Act’s use of the adjective “navigable” indicates a focus on waterways rather than floods, Congress’ use of “waters” instead of “water,” ante, at 732, does not necessarily carry the connotation of “relatively permanent, standing or flowing bodies of water,” ibid. (And contrary to the plurality’s suggestion, ante, at 732, n. 4, there is no indication in the dictionary that the “ ‘flood or inundation’” definition is limited to poetry.) In any event, even granting the plurality’s preferred definition — that “waters” means “water ‘[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes,’ ” ante, at 732 (quoting Webster’s Second 2882) — the dissent is correct to observe that an intermittent flow can constitute a stream, in the sense of “‘[a] current or course of water or other fluid, flowing on the earth,’ ” ante, at 733, n. 6 (quoting Webster’s Second 2493), while it is flowing. See post, at 801 (also noting Court’s use of the phrase “ ‘intermittent stream’ ” in Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U. S. 334, 335 (1933)). It follows that the Corps can reasonably interpret the Act to cover the paths of such impermanent streams.
*771 Apart from the dictionary, the plurality invokes Riverside Bayview to support its interpretation that the term “waters” is so confined, but this reliance is misplaced. To be sure, the Court there compared wetlands to “rivers, streams, and other hydrographic features more conventionally identifiable as ‘waters.’” 474 U. S., at 131. It is quite a stretch to claim, however, that this mention of hydrographic features “echoe[s]” the dictionary’s reference to “ ‘geographical features such as oceans, rivers, [and] lakes.’” Ante, at 735 (quoting Webster’s Second 2882). In fact the Riverside Bayview opinion does not cite the dictionary definition on which the plurality relies, and the phrase “hydrographic features” could just as well refer to intermittent streams carrying substantial flow to navigable waters. See Webster’s Second 1221 (defining “hydrography” as “[t]he description and study of seas, lakes, rivers, and other waters; specifically] . . . [t]he measurement of flow and investigation of the behavior of streams, especially] with reference to the control or utilization of their waters”).
Also incorrect is the plurality’s attempt to draw support from the statutory definition of “point source” as “any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.” 33 U. S. C. § 1362(14). This definition is central to the Act’s regulatory structure, for the term “discharge of a pollutant” is defined in relevant part to mean “any addition of any pollutant to navigable waters from any point source,” § 1362(12). Interpreting the point-source definition, the plurality presumes, first, that the point-source examples describe “watercourses through which intermittent waters typically flow,” and second, that point sources and navigable waters are “separate and distinct categories.” Ante, at 735-736. From this the *772 plurality concludes, by a sort of negative inference, that navigable waters may not be intermittent. The conclusion is unsound. Nothing in the point-source definition requires an intermittent flow. Polluted water could flow night and day from a pipe, channel, or conduit and yet still qualify as a point source; any contrary conclusion would likely exclude, among other things, effluent streams from sewage treatment plants. As a result, even were the statute read to require continuity of flow for navigable waters, certain water bodies could conceivably constitute both a point source and a water. At any rate, as the dissent observes, the fact that point sources may carry continuous flow undermines the plurality’s conclusion that covered “waters” under the Act may not be discontinuous. See post, at 802.
The plurality’s second limitation — exclusion of wetlands lacking a continuous surface connection to other jurisdictional waters — is also unpersuasive. To begin with, the plurality is wrong to suggest that wetlands are “indistinguishable” from waters to which they bear a surface connection. Ante, at 755. Even if the precise boundary may be imprecise, a bog or swamp is different from a river. The question is what circumstances permit a bog, swamp, or other nonnavigable wetland to constitute a “navigable water” under the Act — as § 1344(g)(1), if nothing else, indicates is sometimes possible, see supra, at 767-768. Riverside Bayview addressed that question and its answer is inconsistent with the plurality’s theory. There, in upholding the Corps’ authority to regulate “wetlands adjacent to other bodies of water over which the Corps has jurisdiction,” the Court deemed it irrelevant whether “the moisture creating the wetlands ... find[s] its source in the adjacent bodies of water.” 474 U. S., at 135. The Court further observed that adjacency could serve as a valid basis for regulation even as to “wetlands that are not significantly intertwined with the ecosystem of adjacent waterways.” Id., at 135, n. 9. “If it is reasonable,” the Court explained, “for the Corps to conclude that in the majority *773 of cases, adjacent wetlands have significant effects on water quality and the aquatic ecosystem, its definition can stand.” Ibid.
The Court in Riverside Bayview did note, it is true, the difficulty of defining where “water ends and land begins,” id., at 132, and the Court cited that problem as one reason for deferring to the Corps’ view that adjacent wetlands could constitute waters. Given, however, the further recognition in Riverside Bayview that an overinclusive definition is permissible even when it reaches wetlands holding moisture disconnected from adjacent water bodies, id., at 135, and n. 9, Riverside Bayview's, observations about the difficulty of defining the water’s edge cannot be taken to establish that when a clear boundary is evident, wetlands beyond the boundary fall outside the Corps’ jurisdiction.
For the same reason Riverside Bayview also cannot be read as rejecting only the proposition, accepted by the Court of Appeals in that case, that wetlands covered by the Act must contain moisture originating in neighboring waterways. See id., at 125, 134. Since the Court of Appeals had accepted that theory, the Court naturally addressed it. Yet to view the decision’s reasoning as limited to that issue — an interpretation the plurality urges here, ante, at 751, n. 13— would again overlook the opinion’s broader focus on wetlands’ “significant effects on water quality and the aquatic ecosystem,” 474 U. S., at 135, n. 9. In any event, even were this reading of Riverside Bayview correct, it would offer no support for the plurality’s proposed requirement of a “continuous surface connection,” ante, at 742. The Court in Riverside Bayview rejected the proposition that origination in flooding was necessary for jurisdiction over wetlands. It did not suggest that a flood-based origin would not support jurisdiction; indeed, it presumed the opposite. See 474 U. S., at 134 (noting that the Corps’ view was valid “even for wetlands that are not the result of flooding or permeation” (emphasis added)). Needless to say, a continuous connection *774 is not necessary for moisture in wetlands to result from flooding — the connection might well exist only during floods.
SWANCC, likewise, does not support the plurality’s surface-connection requirement. SWANCC’s holding that “nonnavigable, isolated, intrastate waters,” 531 U. S., at 171, are not “navigable waters” is not an explicit or implicit overruling of Riverside Bayview’s approval of adjacency as a factor in determining the Corps’ jurisdiction. In rejecting the Corps’ claimed authority over the isolated ponds in SWANCC, the Court distinguished adjacent nonnavigable waters such as the wetlands addressed in Riverside Bayview. 531 U. S., at 167, 170-171.
As Riverside Bayview recognizes, the Corps’ adjacency standard is reasonable in some of its applications. Indeed, the Corps’ view draws support from the structure of the Act, while the plurality’s surface-water-connection requirement does not.
As discussed above, the Act’s prohibition on the discharge of pollutants into navigable waters, 33 U. S. C. § 1311(a), covers both the discharge of toxic materials such as sewage, chemical waste, biological material, and radioactive material and the discharge of dredged spoil, rock, sand, cellar dirt, and the like. All these substances are defined as pollutants whose discharge into navigable waters violates the Act. §§ 1311(a), 1362(6), (12). One reason for the parallel treatment may be that the discharge of fill material can impair downstream water quality. The plurality argues otherwise, asserting that dredged or fill material “does not normally wash downstream.” Ante, at 744. As the dissent points out, this proposition seems questionable as an empirical matter. See post, at 806-807. It seems plausible that new or loose fill, not anchored by grass or roots from other vegetation, could travel downstream through waterways adjacent to a wetland; at the least this is a factual possibility that the Corps’ experts can better assess than can the plurality. Silt, whether from natural or human sources, is a major factor *775 in aquatic environments, and it may clog waterways, alter ecosystems, and limit the useful life of dams. See, e. g., Fountain, Unloved, But Not Unbuilt, N. Y. Times, June 5, 2005, section 4, p. 3, col. 1; DePalma, Rebuilding a River Upstate, For the Love of a Tiny Mussel, N. Y. Times, Apr. 26, 2004, section B, p. 1, col. 2; MacDougall, Damage Can Be Irreversible, Los Angeles Times, June 19, 1987, pt. 1, p. 10, col. 4.
Even granting, however, the plurality’s assumption that fill material will stay put, Congress’ parallel treatment of fill material and toxic pollution may serve another purpose. As the Court noted in Riverside Bayview, “the Corps has concluded that wetlands may serve to filter and purify water draining into adjacent bodies of water, 33 CFR § 320.4(b)(2)(vii) (1985), and to slow the flow of surface runoff into lakes, rivers, and streams and thus prevent flooding and erosion, see §§ 320.4(b)(2)(iv) and (v).” 474 U. S., at 134. Where wetlands perform these filtering and runoff-control functions, filling them may increase downstream pollution, much as a discharge of toxic pollutants would. Not only will dirty water no longer be stored and filtered but also the act of filling and draining itself may cause the release of nutrients, toxins, and pathogens that were trapped, neutralized, and perhaps amenable to filtering or detoxification in the wetlands. See U. S. Congress, Office of Technology Assessment, Wetlands: Their Use and Regulation, OTA-O-206, pp. 43, 48-52 (Mar. 1984), http://govinfo.library.unt.edu/ota/ OTA_4/DATA/1984/8433.pdf (hereinafter OTA). In many cases, moreover, filling in wetlands separated from another water by a berm can mean that floodwater, impurities, or runoff that would have been stored or contained in the wetlands will instead flow out to major waterways. With these concerns in mind, the Corps’ definition of adjacency is a reasonable one, for it may be the absence of an interchange of waters prior to the dredge and fill activity that makes protection of the wetlands critical to the statutory scheme.
*776 In sum the plurality’s opinion is inconsistent with the Act’s text, structure, and purpose. As a fallback the plurality suggests that avoidance canons would compel its reading even if the text were unclear. Ante, at 737-738. In SWANCC, as one reason for rejecting the Corps’ assertion of jurisdiction over the isolated ponds at issue there, the Court observed that this “application of [the Corps’] regulations” would raise significant questions of Commerce Clause authority and encroach on traditional state land-use regulation. 531 U. S., at 174. As SWANCC observed, ibid., and as the plurality points out here, ante, at 737, the Act states that “[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use ... of land and water resources,” 33 U. S. C. § 1251(b). The Court in SWANCC cited this provision as evidence that a clear statement supporting jurisdiction in applications raising constitutional and federalism difficulties was lacking. 531 U. S., at 174.
The concerns addressed in SWANCC do not support the plurality’s interpretation of the Act. In SWANCC, by interpreting the Act to require a significant nexus with navigable waters, the Court avoided applications — those involving waters without a significant nexus — that appeared likely, as a category, to raise constitutional difficulties and federalism concerns. Here, in contrast, the plurality’s interpretation does not fit the avoidance concerns it raises. On the one hand, when a surface-water connection is lacking, the plurality forecloses jurisdiction over wetlands that abut navigable-in-fact waters — even though such navigable waters were traditionally subject to federal authority. On the other hand, by saying the Act covers wetlands (however remote) possessing a surface-water connection with a continuously flowing stream (however small), the plurality’s reading would permit applications of the statute as far from traditional federal authority as are the waters it deems beyond *777 the statute’s reach. Even assuming, then, that federal regulation of remote wetlands and nonnavigable waterways would raise a difficult Comerce Clause issue notwithstanding those waters’ aggregate effects on national water quality, but cf. Wickard v. Filburn, 317 U. S. 111 (1942); see also infra, at 782-783, the plurality’s reading is not responsive to this concern' As for States’ “responsibilities and rights,” § 1251(b), it is noteworthy that 33 States plus the District of Columbia have filed an amici brief in this litigation asserting that the Clean Water Act is important to their own water policies. See Brief for State of New York et al. 1-3. These amici note, among other things, that the Act protects downstream States from out-of-state pollution that they cannot themselves regulate. Ibid.
It bears mention also that the plurality’s overall tone and approach — from the characterization of acres of wetlands destruction as “backfilling . . . wet fields,” ante, at 721, to the rejection of Corps authority over “man-made drainage ditches” and “dry arroyos” without regard to how much water they periodically carry, ante, at 734, to the suggestion, seemingly contrary to Congress’ judgment, that discharge of fill material is inconsequential for adjacent waterways, ante, at 744, and n. 11 — seems unduly dismissive of the interests asserted by the United States in these cases. Important public interests are served by the Clean Water Act in general and by the protection of wetlands in particular. To give just one example, amici here have noted that nutrient-rich runoff from the Mississippi River has created a hypoxic, or oxygen-depleted, “dead zone” in the Gulf of Mexico that at times approaches the size of Massachusetts and New Jersey. Brief for Association of State Wetland Managers et al. 21-23; Brief for Environmental Law Institute 23. Scientific evidence indicates that wetlands play a critical role in controlling and filtering runoff. See, e. g., OTA 43, 48-52; R. Tiner, In Search of Swampland: A Wetland Sourcebook and Field Guide 93-95 (2d ed. 2005); Whitmire & Hamilton, Rapid Re *778 moval of Nitrate and Sulfate in Freshwater Wetland Sediments, 34 J. Env. Quality 2062 (2005). It is true, as the plurality indicates, that environmental concerns provide no reason to disregard limits in the statutory text, ante, at 745-746, but in my view the plurality’s opinion is not a correct reading of the text. The limits the plurality would impose, moreover, give insufficient deference to Congress’ purposes in enacting the Clean Water Act and to the authority of the Executive to implement that statutory mandate.
Finally, it should go without saying that because the plurality presents its interpretation of the Act as the only permissible reading of the plain text, ante, at 739, 742, the Corps would lack discretion, under the plurality’s theory, to adopt contrary regulations. The Chief Justice suggests that if the Corps and EPA had issued new regulations after SWANCC they would have “enjoyed plenty of room to operate in developing some notion of an outer bound to the reach of their authority” and thus could have avoided litigation of the issues we address today. Ante, at 758 (concurring opinion). That would not necessarily be true under the opinion The Chief Justice has joined. New rulemaking could have averted the disagreement here only if the Corps had anticipated the unprecedented reading of the Act that the plurality advances.
B
While the plurality reads nonexistent requirements into the Act, the dissent reads a central requirement out— namely, the requirement that the word “navigable” in “navigable waters” be given some importance. Although the Court has held that the statute’s language invokes Congress’ traditional authority over waters navigable in fact or susceptible of being made so, SWANCC, 531 U. S., at 172 (citing Appalachian Power, 311 U. S., at 407-408), the dissent would permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters. The def *779 erence owed to the Corps’ interpretation of the statute does not extend so far.
Congress’ choice of words creates difficulties, for the Act contemplates regulation of certain “navigable waters” that are not in fact navigable. Supra, at 768. Nevertheless, the word “navigable” in the Act must be given some effect. See SWANCC, supra, at 172. Thus, in SWANCC the Court rejected the Corps’ assertion of jurisdiction over isolated ponds and mudflats bearing no evident connection to navigable-in-fact waters. And in Riverside Bayview, while the Court indicated that “the term ‘navigable’ as used in the Act is of limited import,” 474 U. S., at 133, it relied, in upholding jurisdiction, on the Corps’ judgment that “wetlands adjacent to lakes, rivers, streams, and other bodies of water may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water,” id., at 135. The implication, of course, was that wetlands’ status as “integral parts of the aquatic environment” — that is, their significant nexus with navigable waters — was what established the Corps’ jurisdiction over them as waters of the United States.
Consistent with SWANCC and Riverside Bayview and with the need to give the term “navigable” some meaning, the Corps’ jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense. The required nexus must be assessed in terms of the statute’s goals and purposes. Congress enacted the law to “restore and maintain the chemical, physical, and biological integrity of the Nation’s waters,” 33 U. S. C. § 1251(a), and it pursued that objective by restricting dumping and filling in “navigable waters,” §§ 1311(a), 1362(12). With respect to wetlands, the rationale for Clean Water Act regulation is, as the Corps has recognized, that wetlands can perform critical functions related to the integrity of other waters — functions such as pollutant trapping, flood control, and runoff storage. 33 *780 CFR § 320.4(b)(2). Accordingly, wetlands possess the requisite nexus, and thus come within the statutory phrase “navigable waters,” if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as “navigable.” When, in contrast, wetlands’ effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term “navigable waters.”
Although the dissent acknowledges that wetlands’ ecological functions vis-á-vis other covered waters are the basis for the Corps’ regulation of them, post, at 796, it concludes that the ambiguity in the phrase “navigable waters” allows the Corps to construe the statute as reaching all “non-isolated wetlands,” just as it construed the Act to reach the wetlands adjacent to navigable-in-fact waters in Riverside Bayview, see post, at 796. This, though, seems incorrect. The Corps’ theory of jurisdiction in these consolidated cases — adjacency to tributaries, however remote and insubstantial — raises concerns that go beyond the holding of Riverside Bayview; and so the Corps’ assertion of jurisdiction cannot rest on that case.
As applied to wetlands adjacent to navigable-in-fact waters, the Corps’ conclusive standard for jurisdiction rests upon a reasonable inference of ecologie interconnection, and the assertion of jurisdiction for those wetlands is sustainable under the Act by showing adjacency alone. That is the holding of Riverside Bayview. Furthermore, although the Riverside Bayview Court reserved the question of the Corps’ authority over “wetlands that are not adjacent to bodies of open water,” 474 U. S., at 131-132, n. 8, and in any event addressed no factual situation other than wetlands adjacent to navigable-in-fact waters, it may well be the case that Riverside Bayview’s reasoning — supporting jurisdiction without any inquiry beyond adjacency — could apply equally to wetlands adjacent to certain major tributaries. Through regu *781 lations or adjudication, the Corps may choose to identify categories of tributaries that, due to their volume of flow (either annually or on average), their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an aquatic system incorporating navigable waters.
The Corps’ existing standard for tributaries, however, provides no such assurance. As noted earlier, the Corps deems a water a tributary if it feeds into a traditional navigable water (or a tributary thereof) and possesses an ordinary high-water mark, defined as a “line on the shore established by the fluctuations of water and indicated by [certain] physical characteristics,” § 328.3(e). See supra, at 761. This standard presumably provides a rough measure of the volume and regularity of flow. Assuming it is subject to reasonably consistent application, but see U. S. General Accounting Office, Report to the Chairman, Subcommittee on Energy Policy, Natural Resources and Regulating Affairs, Committee on Reform, House of Representatives, Waters and Wetlands: Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction, GAO-04-297, pp. 3-4 (Feb. 2004), http://www.gao.gov/new.items/ d04297.pdf (noting variation in results among Corps district offices), it may well provide a reasonable measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute “navigable waters” under the Act. Yet the breadth of this standard — which seems to leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-faet water and carrying only minor water volumes toward it — precludes its adoption as the determinative measure of whether adjacent wetlands are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood. Indeed, in many cases wetlands adjacent to tributaries covered by this standard might appear *782 little more related to navigable-in-fact waters than were the isolated ponds held to fall beyond the Act’s scope in SWANCC. Cf. Leibowitz & Nadeau, Isolated Wetlands: State-of-the-Science and Future Directions, 23 Wetlands 663, 669 (2003) (noting that “‘isolated’ is generally a matter of degree”).
When the Corps seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction. Absent more specific regulations, however, the Corps must establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries. Given the potential overbreadth of the Corps’ regulations, this showing is necessary to avoid unreasonable applications of the statute. Where an adequate nexus is established for a particular wetland, it may be permissible, as a matter of administrative convenience or necessity, to presume covered status for other comparable wetlands in the region. That issue, however, is neither raised by these facts nor addressed by any agency regulation that accommodates the nexus requirement outlined here.
This interpretation of the Act does not raise federalism or Commerce Clause concerns sufficient to support a presumption against its adoption. To be sure, the significant-nexus requirement may not align perfectly with the traditional extent of federal authority. Yet in most cases regulation of wetlands that are adjacent to tributaries and possess a significant nexus with navigable waters will raise no serious constitutional or federalism difficulty. Cf. Pierce County v. Guillen, 537 U. S. 129, 147 (2003) (upholding federal legislation “aimed at improving safety in the channels of commerce”); Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U. S. 508, 525-526 (1941) (“[Jjust as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in *783 part in flood control on its tributaries .... [T]he exercise of the granted power of Congress to regulate interstate commerce may be aided by appropriate and needful control of activities and agencies which, though intrastate, affect that commerce”). As explained earlier, moreover, and as exemplified by SWANCC, the significant-nexus test itself prevents problematic applications of the statute. See supra, at 776; 531 U. S., at 174. The possibility of legitimate Commerce Clause and federalism concerns in some circumstances does not require the adoption of an interpretation that departs in all cases from the Act’s text and structure. See Gonzales v. Raich, 545 U. S. 1, 17 (2005) (“[W]hen a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence” (internal quotation marks omitted)).
Ill
In both the consolidated cases before the Court the record contains evidence suggésting the possible existence of a significant nexus according to the principles outlined above. Thus the end result in these cases and many others to be considered by the Corps may be the same as that suggested by the dissent, namely, that the Corps’ assertion of jurisdiction is valid. Given, however, that neither the agency nor the reviewing courts properly considered the issue, a remand is appropriate, in my view, for application of the controlling legal standard.

Rapanos

As the dissent points out, in Rapanos, No. 04-1034, an expert whom the District Court found “eminently qualified” and “highly credible,” App. to Pet. for Cert. B7, testified that the wetlands were providing “habitat, sediment trapping, nutrient recycling, and flood peak diminution, reduction flow water augmentation.” 4 Tr. 96 (Apr. 5, 1999). Although the expert had “not studied the upstream drainage of these *784 sites” and thus could not assert that the wetlands were performing important pollutant-trapping functions, ibid., he did observe:
“we have a situation in which the flood water attenuation in that water is held on the site in the wetland . . . such that it does not add to flood peak. By the same token it would have some additional water flowing into the rivers during the drier periods, thus, increasing the low water flow.... By the same token on all of the sites to the extent that they slow the flow of water off of the site they will also accumulate sediment and thus trap sediment and hold nutrients for use in those wetlands systems later in the season as well,” id., at 95-96.
In addition, in assessing the hydrology prong of the three-part wetlands test, see supra, at 761-762, the District Court made extensive findings regarding water tables and. drainage on the parcels at issue. In applying the Corps’ jurisdictional regulations, the District Court found that each of the wetlands bore surface-water connections to tributaries of navigable-in-fact waters.
Much the same evidence should permit the establishment of a significant nexus with navigable-in-fact waters, particularly if supplemented by further evidence about the significance of the tributaries to which the wetlands are connected. The Court of Appeals, however, though recognizing that under SWANCC such a nexus was required for jurisdiction, held that a significant nexus “can be satisfied by the presence of a hydrologic connection.” 376 F. 3d, at 639. Absent some measure of the significance of the connection for downstream water quality, this standard was too uncertain. Under the analysis described earlier, supra, at 779-780, 782, mere hydrologic connection should not suffice in all cases; the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable wa *785 ters as traditionally understood. In my view this case should be remanded so that the District Court may reconsider the evidence in light of the appropriate standard. See, e. g., Pullman-Standard v. Swint, 456 U. S. 273, 291 (1982) (“When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings”).

Carabell

In Carabell, No. 04-1384, the record also contains evidence bearing on the jurisdictional inquiry. The Corps noted in deciding the administrative appeal that “[bjesides the effects on wildlife habitat and water quality, the [district office] also noted that the project would have a major, long-term detrimental effect on wetlands, flood retention, recreation and conservation and overall ecology,” App. 218a. Similarly, in the district office’s permit evaluation, Corps officers observed:
“The proposed work would destroy/adversely impact an area that retains rainfall and forest nutrients and would replace it with a new source area for runoff pollutants. Pollutants from this area may include lawn fertilizers, herbicides, pesticides, road salt, oil, and grease. These pollutants would then runoff directly into the waterway. . . . Overall, the operation and use of the proposed activity would have a major, long term, negative impact on water quality. The cumulative impacts of numerous such projects would be major and negative as the few remaining wetlands in the area are developed.” Id., at 97a-98a.
The Corps’ evaluation further noted that by “eliminating] the potential ability of the wetland to act as a sediment catch basin,” the proposed project “would contribute to increased *786 runoff and . . . accretion along the drain and further downstream in Auvase Creek.” Id., at 98a. And it observed that increased runoff from the site would likely cause downstream areas to “see an increase in possible flooding magnitude and frequency.” Id., at 99a.
The conditional language in these assessments — “potential ability,” “possible flooding” — could suggest an undue degree of speculation, and a reviewing court must identify substantial evidence supporting the Corps’ claims, see 5 U. S. C. § 706(2)(E). Nevertheless, the record does show that factors relevant to the jurisdictional inquiry have already been noted and considered. As in Rapanos, though, the record gives little indication of the quantity and regularity of flow in the adjacent tributaries — a consideration that may be important in assessing the nexus. Also, as in Rapanos, the legal standard applied to the facts was imprecise.
The Court of Appeals, considering the Carabell case after its Rapanos decision, framed the inquiry in terms of whether hydrologic connection is required to establish a significant nexus. The court held that it is not, and that much of its holding is correct. Given the role wetlands play in pollutant filtering, flood control, and runoff storage, it may well be the absence of hydrologic connection (in the sense of interchange of waters) that shows the wetlands’ significance for the aquatic system. In the administrative decision under review, however, the Corps based its jurisdiction solely on the wetlands’ adjacency to the ditch opposite the berm on the property’s edge. As explained earlier, mere adjacency to a tributary of this sort is insufficient; a similar ditch could just as well be located many miles from any navigable-in-fact water and carry only insubstantial flow toward it. A more specific inquiry, based on the significant-nexus standard, is therefore necessary. Thus, a remand is again required to permit application of the appropriate legal standard. See, e. g., INS v. Orlando Ventura, 537 U. S. 12, 16 (2002) (per curiam) (“Generally speaking, a court of appeals should re *787 mand a case to an agency for decision of a matter that statutes place primarily in agency hands”).
* H= *
In these consolidated cases I would vacate the judgments of the Court of Appeals and remand for consideration whether the specific wetlands at issue possess a significant nexus with navigable waters.